J. S34040/20

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| STEVEN LEONARD VERBECK, | : | No. 1947 MDA 2019 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence Entered November 1, 2019,
in the Court of Common Pleas of Centre County
Criminal Division at No. CP-14-CR-0002013-2018

BEFORE:  PANELLA, P.J., BENDER, P.J.E. AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED DECEMBER 10, 2020**

Steven Leonard Verbeck appeals from the November 1, 2019 judgment of sentence of five years of intermediate punishment, with 120 days to be served on in-home detention, entered by the Court of Common Pleas of Centre County, following his conviction of four counts of driving under the influence ("DUI") — controlled substance,[1] and one count each of possession of a small amount of marijuana,[2] DUI — general impairment,[3] possession of drug

---

[1] 75 Pa.C.S.A. §§ 3802(d)(1)(i), (iii), (2), and (3).

[2] 35 P.S. § 780-113(a)(31)(i).

[3] 75 Pa.C.S.A. § 3802(a)(1).

paraphernalia,[4] failing to yield right,[5] driving on roadways laned for traffic,[6] careless driving,[7] and failure to use a safety belt.[8] After careful review, we affirm and deny appellant's motion to file a supplemental brief as moot.

The suppression court and the trial court set forth the following factual and procedural history:

1. On the morning of September 27, 2018, Pennsylvania State Police Troopers Kyle Trate and Ty Ammerman were on patrol on Halfmoon Valley Road in Halfmoon Township. Halfmoon Valley Road is a two-lane road with a double-yellow line running through the middle.

2. Trooper Ammerman was driving and Trooper Trate was in the front passenger seat of the patrol vehicle. The [t]roopers were driving "a little slower than normal driving speed" because they were searching for an injured deer that had reportedly been struck by a vehicle. Trooper Ammerman was operating spotlights in search of the deer.

3. At some point, the [t]roopers encountered two vehicles approaching from the opposite lane of travel. Trooper Ammerman turned off the spotlights.

4. Trooper Trate testified he observed that the second vehicle "had crossed over the double-yellow line into our lane." Trooper Trate

---

[4] 35 P.S. § 780-113(a)(32).

[5] 75 Pa.C.S.A. § 3302.

[6] 75 Pa.C.S.A. § 3309(1).

[7] 75 Pa.C.S.A. § 3714.

[8] 75 Pa.C.S.A. § 4581(a)(2)(ii).

further stated that the second vehicle had "crossed over probably right around half a vehicle length into our lane."

5. [Appellant's] vehicle was approximately fifty feet away when Trooper Trate observed it traveling in the [t]roopers' lane of travel. Trooper Trate opined that the second vehicle's presence in their lane of travel created a risk of collision.

6. Trooper Ammerman similarly testified he observed that the second vehicle "had crossed . . . at least a half a car length across the double-yellow line." Trooper Ammerman estimated [appellant's] vehicle was several hundred feet away when he observed it traveling in the [t]roopers' lane of travel, although he was not certain of the distance. Trooper Ammerman also opined that the second vehicle's presence in the [t]roopers' lane of travel created a safety hazard.

7. Both [t]roopers testified that [appellant's] vehicle was on the double-yellow center line as it approached the [t]roopers' vehicle.

8. The [t]roopers made a u-turn and pursued the second vehicle. After they caught up to the second vehicle, the [t]roopers activated their emergency lights in order to conduct a traffic stop of the vehicle.

9. After the vehicle came to a stop, Trooper Trate approached the vehicle on the passenger side and knocked on the front window. The driver, who was later identified as [appellant], partially rolled down the window.

10. Because he could not communicate clearly with [appellant], Trooper Trate requested that [appellant] roll the window down all the way.

11. Trooper Trate testified he immediately detected the odor of marijuana and a faint odor of alcoholic beverage emanating from within [appellant's] vehicle. On being asked, [appellant] denied possessing any marijuana or having consumed any alcohol.

12. Trooper Trate asked [appellant] to produce his driver's license and the vehicle's registration and insurance information.

13. [Appellant] opened his passenger side glove box while searching for his registration and insurance documents. Trooper Trate observed a firearm in the glove box.

14. Upon observing the firearm, Trooper Trate made a visual inspection of other parts of the vehicle to ensure there were no other weapons inside. He observed rolling papers in the center console of the vehicle.

15. Based on the odor of marijuana and the presence of rolling papers, Trooper Trate suspected there was marijuana in the vehicle.

16. Trooper Trate questioned [appellant] on the purpose of the rolling papers, and he answered that the rolling papers were for smoking cigarettes. He further stated his tobacco was at home.

17. [Appellant] was informed that he was stopped for crossing into the [t]roopers' lane of travel.

18. Because [appellant] had a firearm in the car, Trooper Trate asked him to step outside the vehicle in order to keep him separated from the firearm.

19. Trooper Trate spoke to [appellant] outside the vehicle and smelled a strong odor of alcoholic beverages coming from [appellant's] person. Based on [appellant's] driving and his speech,

which was slurred, Trooper Trate asked [appellant] to submit to standardized field sobriety testing, and [appellant] consented.

20. [Appellant] performed and failed the standardized field sobriety tests. A portable breath test was administered and was positive for alcohol. The [t]roopers placed [appellant] into custody for suspected DUI.

21. Trooper Trate searched [appellant's] person. He located vapor oil and a vape pen in his pocket. [Appellant] stated the oil was CBD.

22. Based on [appellant's] admission that he had CBD oil, the odor of marijuana that Trooper Trate smelled emanating from the car, and the rolling papers he had observed in [appellant's] vehicle, Trooper Trate believed he had probable cause to search the vehicle.

23. Trooper Trate searched [appellant's] car and located a substance he believed was marijuana in the center console area. Subsequent testing confirmed the substance was marijuana.

24. After taking [appellant] into custody, the [t]roopers placed him in their patrol vehicle and headed to Mount Nittany Medical Center ("Hospital") for blood testing.

25. Trooper Trate testified that after taking a DUI suspect into custody, he advises the suspect that standard procedure is to go to the Hospital and ask for a blood draw.

26. Trooper Trate also informs DUI suspects that they will have to be fingerprinted, which takes place at the Centre County jail.

27. Trooper Trate spoke to [appellant] about arrangements for [appellant] to be picked up that night at the Centre County jail after fingerprinting.

28. Trooper Trate could not recall the specific conversation he had with [appellant]. He acknowledged it was possible he informed [appellant] if he was refusing a blood draw they would go straight to fingerprinting.

29. Regardless of whether [appellant] consented to a blood draw, the [t]roopers planned to take him to the Centre County jail for fingerprinting.

30. [Appellant] did not indicate he would not consent to a blood draw, so the [t]roopers took him to the Hospital.

31. At the Hospital, Trooper Trate informed [appellant] the decision of whether or not to consent to a blood draw was for [him] to make, and that Trooper Trate could not give him advice on what to do.

32. Trooper Trate read the applicable portions of Form DL-26, verbatim, to [appellant].

33. [Appellant] also read the Form DL-26.

34. [Appellant] testified he had no difficulty reading the Form DL-26, and he had a clear head on the evening of his arrest.

35. [Appellant] testified he was never advised he would be taken for fingerprinting.

36. Trooper Trate testified that [appellant] verbally consented to a blood draw and also signed Form DL-26.

37. [Appellant] testified he "guesstimated" he consented because of fear of the situation and especially a possible "fine," i.e., the driver's license restoration fee described in the Form DL-26.

> 38. [Appellant] was taken for fingerprinting at the Centre County jail after his blood draw was completed.

Suppression court opinion, 6/25/19 at 2-5 (transcript citations omitted).

On June 25, 2019, the suppression court denied appellant's motion to suppress. On September 6, 2019, following a stipulated non-jury trial, the court convicted appellant of the aforementioned offenses. On November 1, 2019, the trial court sentenced appellant as delineated above. The instant, timely appeal followed. Subsequently, in response to the trial court's order, appellant filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On January 22, 2020, the trial court issued an opinion.[9]

On appeal, appellant raises the following questions for our review:

> I.    Whether the [s]uppression [c]ourt erred in denying [a]ppellant's motion to suppress all evidence and [sic] fruit of the poisonous tree obtained from the traffic stop at issue since the arresting officer did not have the requisite probable cause to believe that [a]ppellant had committed any violations of the Motor Vehicle Code or any laws of this Commonwealth?
>
> II.   Whether the [t]rial [c]ourt erred in denying [a]ppellant's motion to suppress evidence obtained by a warrantless blood draw since: (1) the arresting officer threatened that [a]ppellant could either submit to a blood draw or go to jail, and (2) [a]ppellant was threatened with a $2,000.00 enhanced criminal punishment disguised as a license restoration fee if he

---

[9] In its opinion, the trial court adopted the suppression court's opinion concerning the suppression issues and only addressed the sufficiency of the evidence claims raised by appellant in his Rule 1925(b) statement. Appellant has abandoned these sufficiency claims on appeal.

> refused to submit to a warrantless blood draw, which individually and collectively rendered any purported consent given by [a]ppellant to be unknowing, unintelligent, and involuntarily [sic]?

Appellant's brief at 14.

In both issues on appeal, appellant challenges the denial of his motion to suppress. Appellant first claims the suppression court erred in concluding the state troopers had probable cause to stop his vehicle. (Appellant's brief at 23-34.) He next claims the suppression court erred in concluding he "knowingly, intelligently, and voluntarily" submitted to a blood draw. (**Id.** at 14; **see id.** at 35-45.)

Our standard of review for challenges to the denial of a suppression motion:

> is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where . . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. McAdoo*, 46 A.3d 781, 783-784 (Pa.Super. 2012) (citations omitted), *appeal denied*, 65 A.3d 413 (Pa. 2013) (parallel citation omitted).

With these principles in mind, we note the suppression court authored a comprehensive and well-reasoned opinion, which properly addresses and disposes of appellant's two claims.[10]  Specifically, the court found the testimony of the two state troopers was credible and believed their version of the events.  (Suppression court opinion, 6/25/19 at 10, 14.)  We are bound by those credibility findings.  *Commonwealth v. George*, 878 A.2d 881, 883 (Pa.Super. 2005), *appeal denied*, 891 A.2d 730 (Pa. 2005) (parallel citation omitted).

Moreover, the suppression court viewed the mobile video recording ("MVR") of the incident and determined it supported the troopers' testimony.[11]

---

[10] On appeal, appellant abandoned the claim raised in his motion to suppress the search of his motor vehicle was unconstitutional.

[11] On appeal, appellant challenges the trial court's finding the MVR supported the troopers' testimony.  (Appellant's brief at 26-27.)  We are unable to review this claim because, while the videos are contained within the certified record, they are not in a format this court is able to access.  It is the appellant's responsibility to make certain the certified record contains all items necessary, and in a reviewable format, to ensure this court is able to assess his claims.  *See Commonwealth v. B.D.G.*, 959 A.2d 362, 372 (Pa.Super. 2008) (*en banc*).  This [c]ourt has stated:

> It is black letter law in this jurisdiction that an
> appellate court cannot consider anything which is not
> part of the record in the case.  It is also well-settled
> in this jurisdiction that it is [a]ppellant's responsibility
> to supply this [c]ourt with a complete record for

(Suppression court opinion, 6/25/19 at at 10.)  We further agree with the court, based upon their testimony and the MVR, the troopers had probable cause to stop appellant's vehicle.  (***Id.*** at 9-10.)

Additionally, we agree with the suppression court's finding that appellant's claims his consent to the blood draw was not knowing, intelligent, and voluntary and the restoration fee provision in Form DL-26 was a threat of an enhanced criminal penalty lack merit.  (***Id.*** at 11-15.)  Accordingly, we adopt the pertinent portions of the suppression court's well-reasoned June 25, 2019 opinion as our own and affirm on that basis.

Judgment of sentence affirmed.  Motion to file a supplemental brief denied.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/10/2020

---

purposes of review.  A failure by appellant to insure that the original record certified for appeal contains sufficient information to conduct a proper review constitutes waiver of the issue sought to be examined.

***Commonwealth v. Martz***, 926 A.2d 514, 524-525 (Pa.Super. 2007) (citations and quotation marks omitted).  Because appellant failed to ensure the certified record contained the MVR in a format which could be viewed by this court, he waived any challenge to the trial court's interpretation of it.

**IN THE COURT OF COMMON PLEAS OF CENTRE COUNTY, PENNSYLVANIA
CRIMINAL ACTION - LAW**

COMMONWEALTH OF PENNSYLVANIA          :
                                      :
                                      :
v.                                    :          No. CP-14-CR-2013-2018
                                      :
STEVEN VERBECK                        :
          Defendant                   :

*Attorney for the Commonwealth*:                 *Matthew F. Metzger, Esquire*
*Attorney for Defendant*:                        *Marc A. Decker, Esquire*

## OPINION and ORDER

### A. Background

Presently before the Court is Defendant's Omnibus Pre-Trial Motion in the nature of a motion to suppress evidence. Defendant contends his rights to be free from unreasonable searches and seizures under the United States and Pennsylvania Constitutions were violated in connection with a stop and search of his vehicle and a blood test administered on the night of his arrest for driving under the influence ("DUI") charges.

Defendant is charged with the following crimes: Possession of Marijuana, Small Amount Personal Use, 35 Pa.C.S.A. § 780-113(a)(31); Use/Possession of Drug Paraphernalia, 35 Pa.C.S.A. § 780-113(a)(32); DUI, General Impairment/ Incapable of Driving Safely, Second Offense, 75 Pa.C.S.A. § 3802 (a)(1); DUI, High Rate of Alcohol, Second Offense, 75 Pa.C.S.A. § 3802(b); DUI, Controlled Substance, Schedule I, Second Offense, 75 Pa.C.S.A. § 3802(d)(1)(i); DUI, Controlled Substance, Metabolite, Second Offense, 75 Pa.C.S.A. § 3802(d)(1)(iii); DUI, Controlled Substance, Impaired Ability, Second Offense, 75 Pa.C.S.A. § 3802(d)(2); DUI, Controlled Substance, Combination Alcohol/Drug, Second Offense, 75 Pa.C.S.A. § 3802(d)(3); Failing to Yield to the Right, 75 Pa.C.S.A. § 3302; Disregarding Traffic Lane (Single), 75 Pa.C.S.A. § 3309(1); Careless Driving, 75 Pa.C.S.A. § 3714(a); and, Failing to Use Safety Belt, Driver and Front Seat Occupant, 75 Pa.C.S.A. § 4581(a)(2)(ii).

A hearing on Defendant's omnibus motion was held on March 25, 2019, and the Parties thereafter submitted briefs in support of their respective motions and positions. For the reasons set forth below, Defendant's motion to suppress is denied.

O ☐ RD ☐ S

**B. *Findings of Fact***

1.      On the morning of September 27, 2018, Pennsylvania State Police Troopers Kyle Trate and Ty Ammerman were on patrol on Halfmoon Valley Road in Halfmoon Township. Halfmoon Valley Road is a two-lane road with a double-yellow line running through the middle. (Tr. Suppr. Hr'g., 3-25-19, at 7-8).

2.      Trooper Ammerman was driving and Trooper Trate was in the front passenger seat of the patrol vehicle. The Troopers were driving "a little slower than normal driving speed" because they were searching for an injured deer that had reportedly been struck by a vehicle. (*Id.* at 44). Trooper Ammerman was operating spotlights in search of the deer. (*Id.* at 21).

3.      At some point, the Troopers encountered two vehicles approaching from the opposite lane of travel. Trooper Ammerman turned off the spotlights. (*Id.*).

4.      Trooper Trate testified he observed that the second vehicle "had crossed over the double-yellow line into our lane." (*Id.* at 8). Trooper Trate further stated that the second vehicle had "crossed over probably right around half a vehicle length into our lane." (*Id.*).

5.      Defendant's vehicle was approximately fifty feet away when Trooper Trate observed it traveling in the Troopers' lane of travel. Trooper Trate opined that the second vehicle's presence in their lane of travel created a risk of collision. (*Id.*).

6.      Trooper Ammerman similarly testified he observed that the second vehicle "had crossed . . . at least a half a car length across the double-yellow line." (*Id.* at 43). Trooper Ammerman estimated Defendant's vehicle was several hundred feet away when he observed it traveling in the Troopers' lane of travel, although he was not certain of the distance. (*Id.* at 44). Trooper Ammerman also opined that the second vehicle's presence in the Troopers' lane of travel created a safety hazard. (*Id.* at 45).

7.      Both Troopers testified that Defendant's vehicle was on the double-yellow center line as it approached the Troopers' vehicle. (*See Id.* at 22, 43-44).

8.      The Troopers made a u-turn and pursued the second vehicle. (*Id.* at 10). After they caught up to the second vehicle, the Troopers activated their emergency lights in order to conduct a traffic stop of the vehicle. (*Id.*).

9.      After the vehicle came to a stop, Trooper Trate approached the vehicle on the passenger side and knocked on the front window. The driver, who was later identified as Defendant Steven Verbeck, partially rolled down the window. (*Id.*).

2

10. Because he could not communicate clearly with Defendant, Trooper Trate requested that Defendant roll the window down all the way. (*Id.*).

11. Trooper Trate testified he immediately detected the odor of marijuana and a faint odor of alcoholic beverage emanating from within Defendant's vehicle. On being asked, Defendant denied possessing any marijuana or having consumed any alcohol. (*Id.* at 11-12).

12. Trooper Trate asked Defendant to produce his driver's license and the vehicle's registration and insurance information. (*Id.*).

13. Defendant opened his passenger side glove box while searching for his registration and insurance documents. Trooper Trate observed a firearm in the glove box. (*Id.*).

14. Upon observing the firearm, Trooper Trate made a visual inspection of other parts of the vehicle to ensure there were no other weapons inside. He observed rolling papers in the center console of the vehicle. (*Id.*).

15. Based on the odor of marijuana and the presence of rolling papers, Trooper Trate suspected there was marijuana in the vehicle. (*Id.* at 13).

16. Trooper Trate questioned Defendant on the purpose of the rolling papers, and he answered that the rolling papers were for smoking cigarettes. He further stated his tobacco was at home. (*Id.* at 13-14).

17. Defendant was informed that he was stopped for crossing into the Troopers' lane of travel. (*Id.*).

18. Because Defendant had a firearm in the car, Trooper Trate asked him to step outside the vehicle in order to keep him separated from the firearm. (*Id.* at 15).

19. Trooper Trate spoke to Defendant outside the vehicle and smelled a strong odor of alcoholic beverages coming from Defendant's person. Based on Defendant's driving and his speech, which was slurred, Trooper Trate asked Defendant to submit to standardized field sobriety testing, and Defendant consented. (*Id.*).

20. Defendant performed and failed the standardized field sobriety tests. A portable breath test was administered and was positive for alcohol. The Troopers placed Defendant into custody for suspected DUI. (*Id.* at 16).

21. Trooper Trate searched Defendant's person. He located vapor oil and a vape pen in his pocket. Defendant stated the oil was CBD. (*Id.*).

3

22.     Based on Defendant's admission that he had CBD oil, the odor of marijuana that Trooper Trate smelled emanating from the car, and the rolling papers he had observed in Defendant's vehicle, Trooper Trate believed he had probable cause to search the vehicle. (*Id.* at 16-17).

23.     Trooper Trate searched Defendant's car and located a substance he believed was marijuana in the center console area. Subsequent testing confirmed the substance was marijuana. (*Id.*).

24.     After taking Defendant into custody, the Troopers placed him in their patrol vehicle and headed to Mount Nittany Medical Center ("Hospital") for blood testing. (*Id.*).

25.     Trooper Trate testified that after taking a DUI suspect into custody, he advises the suspect that standard procedure is to go to the Hospital and ask for a blood draw. (*Id.* at 65).

26.     Trooper Trate also informs DUI suspects that they will have to be fingerprinted, which takes place at the Center County jail. (*Id.*)

27.     Trooper Trate spoke to Defendant about arrangements for Defendant to be picked up that night at the Centre County jail after fingerprinting. (*Id.* at 66).

28.     Trooper Trate could not recall the specific conversation he had with Defendant. He acknowledged it was possible he informed Defendant if he was refusing a blood draw they would go straight to fingerprinting. (*Id.* at 65).

29.     Regardless of whether Defendant consented to a blood draw, the Troopers planned to take him to the Centre County jail for fingerprinting. (*Id.*).

30.     Defendant did not indicate he would not consent to a blood draw, so the Troopers took him to the Hospital. (*Id.*).

31.     At the Hospital, Trooper Trate informed Defendant the decision of whether or not to consent to a blood draw was for Defendant to make, and that Trooper Trate could not give him advice on what to do. (*Id.* at 18).

32.     Trooper Trate read the applicable portions of Form DL-26, verbatim, to Defendant. (*Id.*).

33.     Defendant also read the Form DL-26. (*Id.* at 55).

34.     Defendant testified he had no difficulty reading the Form DL-26, and he had a clear head on the evening of his arrest. (*Id.* at 58).

4

35.     Defendant testified he was never advised he would be taken for fingerprinting. (*Id.* at 63).

36.     Trooper Trate testified that Defendant verbally consented to a blood draw and also signed Form DL-26. (*Id.* at 19).

37.     Defendant testified he "guesstimated" he consented because of fear of the situation and especially a possible "fine," i.e., the driver's license restoration fee described in the Form DL-26. (*Id.* at 56).

38.     Defendant was taken for fingerprinting at the Centre County jail after his blood draw was completed. (*Id.* at 63-64).

C. *Conclusions of Law*

1.     The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution both guarantee the right to be free from unreasonable searches and seizures. *See* U.S. Constit, amend. IV; PA Constit., art. 1, § 8.

2.     As a general rule, warrantless searches are unreasonable *per se*. *Commonwealth v. Evans*, 153 A.3d 323, 327 (Pa. Super. 2016).

3.     Limited exceptions to the warrant requirement have been carved out by court decisions, including the consent exception, exigent circumstances exception, the automobile exception and the search incident to arrest exception, among a handful of others. *Id.* at 327-28.

4.     A vehicle stop constitutes a seizure of the vehicle and its occupants. *See Commonwealth v. Chase*, 960 A.2d 108, 113 (Pa. 2008).

5.     A suppression court is required to undertake an independent evaluation in determining whether a law enforcement officer had the requisite quantum of cause to stop a vehicle for a suspected traffic violation. *See Commonwealth v. Holmes*, 14 A.3d 89, 97-98 (Pa. 2011) (holding independent evaluation required in context of "reasonable suspicion" finding).

6.     When considering the "quantum of cause" required for a lawful vehicle stop, the nature of the suspected violation must be considered. *Commonwealth v. Ibrahim*, 127 A.3d 819, 823-25 (Pa. Super. 2015), *appeal denied*, 138 A.3d 3 (Pa. 2016); *Commonwealth v. Feczko*, 10 A.3d 1285, 1290-91 (Pa. Super. 2010), *appeal denied*, 25 A.3d 327 (Pa. 2011).

7.     Section 6308(b) of the Pennsylvania Vehicle Code defines the requisite cause to conduct a traffic stop as follows:

5

(b) Authority of police officer.—Whenever a police officer is engaged in a systematic program of checking vehicles or drivers or has reasonable suspicion that a violation of this title is occurring or has occurred, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

75 Pa.C.S.A. § 6308(b).

8. The reasonable suspicion standard in § 6308(b) does not apply to all traffic stops, because not all vehicle offenses require further investigation. *Chase*, 960 A.2d at 115-116. An officer must possess probable cause that a violation of the Vehicle Code occurred to effectuate a traffic stop when the detention will not serve any investigative purpose. *Id.*; *see also Commonwealth v. Salter*, 121 A.3d 987, 992-93 (Pa. Super. 2015).

9. Probable cause to stop a vehicle exists when the facts and circumstances within the officer's knowledge at the time of the stop are sufficient to "warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime." *Ibrahim*, 127 A.3d at 824.

10. Conclusory statements are insufficient to demonstrate reasonable suspicion or probable cause; the Commonwealth must produce testimony or other evidence to "articulate at least some fact or facts to support [the] inference or conclusion . . . ." *Commonwealth v. Holmes*, 14 A.3d at 97.

11. Section 3302 of the Vehicle Code provides:

Drivers of vehicles proceeding in opposite directions shall pass each other to the right and, upon roadways having width for not more than one line of traffic in each direction, each driver shall give to the other at least one-half of the main-traveled portion of the roadway as nearly as possible.

75 Pa.C.S.A. § 3302.

12. Section 3309 of the Vehicle Code provides:

Whenever any roadway has been divided into two or more clearly marked lanes for traffic the following rules in addition to all others not inconsistent therewith shall apply:

6

> **(1) Driving within single lane.**--A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety.

75 Pa. C.S. § 3309(1).

13. Probable cause to stop a vehicle for a violation of § 3309(1) requires that a defendant leave his or her lane of travel in a manner that creates a safety risk or hazard. *See e.g., Commonwealth v. Gleason*, 785 A.2d 983, 989 (Pa. 2001); *Commonwealth v. Garcia*, 859 A.2d 820 (Pa. Super. 2004).

14. A "momentary and minor" deviation from a single lane does not give rise to a § 3309(1) violation, and will not support probable cause to conduct a vehicle stop for a suspected § 3309(1) violation. *Garcia*, 859 A.2d at 823.

15. In *Commonwealth v. Gary*, 91 A.3d 102 (Pa. 2014), the Pennsylvania Supreme Court adopted the federal automobile exception to the warrant requirement. Thus, the only "prerequisite for a warrantless search of a motor vehicle is probable cause to search." *Gary*, 91 A.3d at 138.

16. The United States Supreme Court and Pennsylvania appellate courts have found that the odor of illegal drugs is sufficient to establish probable cause to search a vehicle. *See United States v. Ventresca*, 380 U.S. 102 (1965); *Johnson v. United States*, 333 U.S. 10 (1948); *Commonwealth v. Jones*, 121 A.3d 524, 529 (Pa. Super. 2015) (odor of marijuana held to be sufficient cause to arrest for DUI and to request blood testing); *Commonwealth v. Gelineau*, 696 A.2d 188, 192 (Pa. Super. 1997); *Commonwealth v. Stainbrook*, 471 A.2d 1223, 1225 (Pa. Super. 1984) ("where an officer is justified in being where he is, his detection of the odor of marijuana is sufficient to establish probable cause"); *Commonwealth v. Stoner*, 344 A.2d 633 (Pa. Super. 1975).

17. Blood testing performed at the government's behest is a search under the federal and state constitutions, requiring either a search warrant or the existence of an exception. *Commonwealth v. Evans*, 153 A.3d at 328.

18. In *Birchfield v. North Dakota*, 136 S.Ct. 2160 (2016), the United States Supreme Court held that the search incident to lawful arrest exception is not applicable to warrantless blood testing in DUI cases. *Id.* at 2185.

7

19.     The *Birchfield* Court further held that state laws that impose criminal penalties for a driver's refusal to consent to a blood test violate the Fourth Amendment. *Id.* at 2186. The Court concluded that "motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." *Id.*

20.     Following *Birchfield*, the Pennsylvania Superior Court determined that Pennsylvania's then existing implied consent statute, which provided that drivers in Pennsylvania were deemed to have given consent to blood alcohol testing for suspected DUI, and that a refusal to submit to such testing subjected the driver to enhanced penalties if convicted of DUI, "undoubtedly 'imposes criminal penalties on the refusal to submit to such a test,'" thus violating the rule of *Birchfield*. *See Evans*, 153 A.3d at 330-31 (analyzing 75 Pa. C.S. §§1547, 3802-3804).[1]

21.     In *Evans, supra*, the Superior Court remanded to the trial court to determine the validity of the defendant's consent based on the totality of the circumstances when the defendant had been informed, despite the holding in *Birchfield*, that a refusal of blood testing would subject him to enhanced criminal penalties under Pennsylvania's DUI statutes. *Evans*, 153 A.3d at 331.

22.     *Birchfield*'s prohibitions do not apply to civil penalties. *Boseman v. Dep't of Transp., Bureau of Driver Licensing*, 157 A.3d 10, 21 (Pa. Commw. Ct. 2017), *appeal denied*, 642 Pa. 470 (Pa. 2017).

23.     When asserting consent as an exception to the warrant requirement, the Commonwealth bears the burden of proving that the defendant's consent is "the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne." *Commonwealth v. Ennels*, 167 A.3d 716, 723 (Pa. Super. 2017) (citing *Commonwealth v. Smith*, 77 A.3d 562, 573 (Pa. 2013)).

24.     In evaluating whether consent was voluntary, courts must look to the totality of the circumstances and undertake an objective assessment of "what a reasonable person would have understood by the exchange between the officer and the person who gave the consent." *Id.*

25.     In conducting such evaluations, courts take into account the maturity, sophistication and mental or emotional state of the defendant. *Id.*

---

[1] The Court notes that *Evans* involved the prior version of Pennsylvania's implied consent statute, which has since been amended by the General Assembly to comply with *Birchfield*.

**D.** *Discussion*

In a suppression hearing, the Commonwealth bears both the burden of production and persuasion, *see Commonwealth v. Carper*, 172 A.3d 613, 616-17 (Pa. Super. 2017), *appeal denied*, 184 A.3d 540 (Pa. 2018), and must establish by a preponderance of the evidence that the evidence at issue was lawfully obtained. *Id.*

*1. Vehicle Stop*

Both Parties agree the Troopers needed probable cause to stop Defendant's vehicle for violating § 3302 and § 3309(1) of the Vehicle Code. As such, the facts and circumstances within the Troopers' knowledge when they stopped Defendant must have been sufficient to "'warrant a man of reasonable caution in the belief that [Defendant had] committed or [was] committing a crime.'" *Ibrahim*, 127 A.3d at 824 (quoting *Commonwealth v. Rodriguez*, 585 A.2d 988, 990 (Pa. 1991)). Conclusory statements are insufficient to establish probable cause. The Commonwealth is required to produce evidence demonstrating facts to support any inferences or conclusions. *Commonwealth v. Holmes*, 14 A.3d at 97.

A violation of § 3309 of the Vehicle Code occurs when a driver deviates from his or her travel lane in a manner that creates a safety hazard. *See Commonwealth v. Gleason, supra.* At the suppression hearing, Trooper Trate and Trooper Ammerman both testified they observed Defendant's vehicle cross the double-yellow line and into their lane of travel. Trooper Trate testified he first saw Defendant's vehicle as it was travelling behind another vehicle on Halfmoon Valley Road, coming toward the Troopers' vehicle in the opposite lane of travel. As the vehicles approached, Trooper Trate observed that Defendant's vehicle had crossed the double-yellow center line, and was approximately half a vehicle length into the Troopers' lane of travel. Trooper Trate estimated that Defendant's vehicle was fifty feet from the Troopers' vehicle at that point in time. He further testified that, although Defendant's vehicle moved back toward its own lane of travel as it approached the Troopers' vehicle, it was still on the center line when it was passing by the Troopers.

Trooper Ammerman likewise testified that he observed Defendant's vehicle approximately half a car length over the double-yellow line while approaching the Troopers' vehicle from the opposite direction of travel. He further stated that, although Defendant's vehicle moved back toward its own lane as it approached, the tires on the vehicle were still on the double-yellow line as it passed by the Troopers' vehicle. Trooper Ammerman estimated that

9

Defendant's vehicle was several hundred feet away when he initially observed it crossing the center lane.[2]

Both Troopers believed Defendant's vehicle crossing the center line created a safety hazard. The Court accepted the testimony of both Troopers as credible and as supported by their observations. The Commonwealth also introduced the mobile video recording ("MVR"), which showed Defendant's vehicle crossing the center line into the path of opposing traffic while in the vicinity of other traffic, including the Troopers' oncoming vehicle. The Court concludes the evidence is sufficient to establish that the Troopers had probable cause to believe Defendant was violating § 3309(1) of the Vehicle Code. Consequently, the vehicle stop was lawful.

In addition, the evidence demonstrated the Troopers had probable cause to believe Defendant was violating § 3302 of the Vehicle Code. Under § 3302, a driver must give a driver approaching from the opposite direction at least one half of the main-traveled portion of the roadway as nearly as possible as the drivers pass by each other. 75 Pa.C.S.A. § 3302. Both Troopers testified that Defendant's vehicle was on the center line as it passed by the Troopers' vehicle and that there were no obstructions in the roadway that might have prevented Defendant from keeping his vehicle fully in his own lane. The Court determines the Troopers' testimony is sufficient to demonstrate the existence of probable cause to believe a violation of § 3302 was occurring.

### 2. Vehicle Search

In his motion to suppress, Defendant contends the warrantless search of his car, which resulted in confiscation of marijuana, was unconstitutional because there were no exigent circumstances when the search was conducted. (Def.'s Omnib. Mot., 2/14/19, at ¶¶ 24-27). The Court notes Defendant failed to address this issue in his brief and that this failure could be considered a waiver. Nonetheless, the Court will address the issue on the merits.

The United States Supreme Court has recognized an "automobile exception" to the Fourth Amendment's warrant requirement. *See Maryland v. Dyson*, 527 U.S. 465 (1999). By application of that exception, law enforcement officers may search an automobile without first

---

[2] Defendant argues Trooper Ammerman testified that Defendant's vehicle was *seven hundred* feet away when he first observed it straddling the center line. (Def's Memo. Supp. Omnib. Mot., at unnumbered p.6). This is not accurate. Trooper Ammerman's reference was to *several hundred* feet, and was an estimate. (*See* Tr. Supp. Hr'g, 3-25-19, at 44).

obtaining a warrant provided that probable cause exists to believe contraband is present in the vehicle. *See id.* The Pennsylvania Supreme Court adopted the federal automobile exception for claims raised under the Pennsylvania Constitution in *Commonwealth v. Gary*, 91 A.3d 102 (Pa. 2014). Under the Pennsylvania Constitution, "the [only] prerequisite for a warrantless search of a motor vehicle is probable cause to search; no exigency beyond the inherent mobility of a motor vehicle is required." *Id.* at 138. Pennsylvania courts have found that the odor of marijuana is sufficient to establish probable cause to search, *Commonwealth v. Stoner*, 344 A.2d 633 (Pa. Super. 1975), as long as law enforcement is justified in being at the location where the odor of marijuana is detected. *Commonwealth v. Stainbrook*, 471 A.2d 1223, 1225 (Pa. Super. 1984).

In the instant case, Trooper Trate testified that, after Defendant's vehicle was stopped, he approached Defendant's vehicle and knocked on the front passenger side window signaling for Defendant to roll it down. Defendant partially opened his front passenger side window. Because Trooper Trate was unable to communicate clearly with Defendant, he requested Defendant to roll the window down all the way. Defendant complied with Trooper Trate's request. Immediately after Defendant rolled down the window, Trooper Trate smelled a strong odor of marijuana emanating from inside Defendant's car. Trooper Trate testified to having training and experience in marijuana detection and identification, and the Court found his testimony regarding the odor of marijuana coming from the vehicle to be credible. In addition, Trooper Trate was justified in being present at the side of Defendant's vehicle because he was conducting a lawful traffic stop. Given all these facts, and based on the authorities discussed above, the Court concludes the Troopers had probable cause to conduct a warrantless search of Defendant's car.

### 3. Blood Draw

Defendant contends his consent for the blood draw was not given voluntarily. He complains that the restoration fee provision in Form DL-26 was a threat of enhanced criminal penalties that rendered his consent involuntary under the rule of *Birchfield v. North Dakota*, 136 S.Ct. 2160 (2016). Defendant further argues he signed Form DL-26 as a result of coercion and duress from the Troopers.

Form DL-26 contains the following language:

> 2. I am requesting that you submit to a chemical test of blood.
> 3. If you refuse to submit to the blood test, your operating privilege will be suspended for at least 12 months. If you previously refused

11

> a chemical test or were previously convicted of driving under the influence, your operating privilege will be suspended for up to 18 months. *If your operating privilege is suspended for refusing chemical testing, you will have to pay a restoration fee of up to $2,000 in order to have your operating privilege restored.*

(Def.'s Omnib. Mot., 5/13/19, Exh. B) (emphasis added). ·

In *Birchfield v. North Dakota, supra,* the United States Supreme Court held that state laws that impose criminal penalties for a driver's refusal to consent to a blood test violate the Fourth Amendment. 136 S. Ct. at 2186. In so holding, the Court observed:

> Our prior opinions have referred approvingly to the general concept of implied-consent laws that impose *civil penalties and evidentiary consequences* on motorists who refuse to comply. Petitioners do not question the constitutionality of those laws, and nothing we say here should be read to cast doubt on them.
>
> It is another matter, however, for a State not only to insist upon an intrusive blood test, but also to impose criminal penalties on the refusal to submit to such a test. There must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads.

*Id.* at 2185 (emphasis added).

Notably, *Birchfield* does not prohibit states from imposing civil penalties for failure to submit to warrantless blood tests. *Boseman v. Dep't of Transp., Bureau of Driver Licensing,* 157 A.3d 10, 21 (Pa. Commw. Ct. 2017), *appeal denied,* 642 Pa. 470 (Pa. 2017). Rather, *Birchfield* seemingly intended to leave intact implied consent laws that impose civil penalties on drivers who refuse to take a blood alcohol test. *See Commonwealth v. Bell,* 167 A.3d 744, 749-750 (Pa. Super. 2017). In *Bell,* the Pennsylvania Superior Court recognized that there is no absolute right to refuse chemical testing in Pennsylvania. The *Bell* Court stated:

> Driving in Pennsylvania is a civil privilege conferred on individuals who meet the necessary qualifications set forth in the Vehicle Code.... Under the terms of the Implied Consent Law, one of the necessary qualifications to continuing to hold that privilege is that a motorist must submit to chemical sobriety testing, when requested to do so by an authorized law enforcement officer in accordance with the prerequisites of the Implied Consent Law. The obligation to submit to testing is related specifically to the motorist's continued enjoyment of the privilege of maintaining his operator's license.

*Commonwealth v. Bell,* 167 A.3d at 749.[3]

---

[3] Pennsylvania's Implied Consent Law provides: "Any person who drives, operates or is in actual physical control of

12

In light of the authorities discussed above, the Court is not persuaded by Defendant's argument in the instant case that the license restoration fee in Form DL-26 violates the rule of *Birchfield*. Form DL-26 does not contain any reference to enhanced criminal penalties. The penalties in Form DL-26 are limited to a driver's license suspension and a restoration fee of up to $2,000.00. The Court recognizes that driving privileges are important to Pennsylvanians. However, as our appellate courts have recognized, that fact alone does not turn the civil penalties in Form DL-26 into criminal sanctions. *See Marchese v. Commonwealth*, 169 A.3d 733, 738 (Pa. Commw. Ct. 2017) (noting that license suspension for refusal to submit to chemical testing does not involve criminal proceedings).

The Court is likewise not convinced that *Shoul v. Bureau of Driver Licensing*, 173 A.3d 669 (Pa. 2017), applies in this case. In *Shoul*, the Pennsylvania Supreme Court held that lifetime disqualification of a commercial driver's license constituted "punishment" for purposes of determining whether the Pennsylvania Department of Transportation violated the appellee's Eighth Amendment right to be free from cruel and unusual punishment. *Id.* at 688. In the present case, Defendant does not complain that his Eighth Amendment right was violated. Instead, he complains the penalties included in Form DL-26 vitiated his consent such that the blood draw taken must be deemed a warrantless search in derogation of the Fourth Amendment. Unlike in *Shoul*, the issue in the instant case does not revolve around whether the license restriction and restoration fee constitutes *punishment*; rather, the issue is whether the license restoration fee constitutes an enhanced *criminal* penalty. Based on Pennsylvania appellate authority to date, the Court determines this question must be answered in the negative. *See e.g. Marchese, supra.*

Defendant also argues his consent to blood testing was involuntary because it was the product of coercion and duress. (Def.'s Memo. Supp. Omnib. Mot., at unnumbered p. 11). The Court must look at the totality of circumstances in evaluating whether Defendant's consent to the blood draw on September 27, 2018 was voluntarily given. *See Commonwealth v. Ennels*, 167 A.3d at 723. That entails an objective examination of the maturity, sophistication and mental or emotional state of the defendant, as well as the overall totality of the circumstances presented.

---

the movement of a vehicle in this Commonwealth shall be deemed to have given consent to one or more chemical tests of breath or blood for the purpose of determining the alcoholic content of blood or the presence of a controlled substance if a police officer has reasonable grounds to believe the person to have been driving, operating or in actual physical control of the movement of a vehicle in violation of section 1543(b)(1.1)." 75 Pa.C.S.A. § 1547(a).

13

*See Ennels*, 167 A.3d 716, 723. Factors for a court to consider in evaluating consent include: (1) whether the defendant was in custody at the time; (2) the use of duress or coercive tactics by law enforcement; (3) the defendant's knowledge of the right to refuse consent; (4) the defendant's education and intelligence; (5) the defendant's belief that incriminating evidence would not be found; and, (6) the extent and level of the defendant's cooperation with law enforcement. *Commonwealth v. Miller*, 186 A.3d 448, 451 (Pa. Super. 2018) (citing *Commonwealth v. Cleckley*, 738 A.2d 427, 433 n.7 (Pa. 1999)).

Applying the first factor in the present case, Defendant was in custody when he consented to a blood draw, a factor which arguably weighs against a finding of voluntary consent. As to the second factor, however, the Court finds no merit in Defendant's argument that the Troopers obtained his consent through coercive tactics. Defendant was advised both orally and in writing that he was *not* required to submit to a blood draw and could refuse. His consent was given only after ample opportunity on his part to consider his choices. The Court did not find Defendant's testimony that Trooper Trate threatened to jail him if he refused to consent, and that fingerprinting was never discussed with him, to be credible. Trooper Trate testified that, after DUI suspects are arrested and in the patrol car, it is standard practice to talk to them regarding fingerprinting, which is done at the Centre County jail. In situations where a suspect makes clear he or she will not consent to a blood draw, Trooper Trate takes them directly to fingerprinting. In this case, Trooper Trate acknowledged he may have asked if Defendant was going to consent to a blood draw, or if he wanted to skip the blood testing and go to fingerprinting. Whether he consented to a blood draw or not, the Troopers intended to have Defendant fingerprinted. Notably, during the drive to the Hospital, Trooper Trate made arrangements for Defendant to be picked up at the jail after fingerprinting. The Court concludes no reasonable person in Defendant's position would have felt he would be jailed if he did not consent to the blood draw.

As to the third factor, the evidence established that Defendant was informed on multiple occasions that he had a right to decline blood testing. Trooper Trate testified he read Form DL-26 to Defendant at the Hospital. Defendant testified Trooper Trate gave him an opportunity to read Form DL-26 and that he read the document.

Regarding factor number four, Defendant testified at the hearing and did not appear to have any mental or intellectual deficiencies or limitations. He testified that he was able to read

14

and understand Form DL-26. He also indicated he had a clear mind on the night of his arrest. Regarding the fifth factor, there was no evidence regarding whether Defendant believed the blood draw would or would not produce incriminating evidence. Finally, testimony at the suppression hearing indicated the Defendant was generally cooperative throughout the police encounter on the night of his arrest.

In light of the totality of the circumstances in this case, the Court finds that no reasonable person would have felt coerced to consent to a blood draw, and that the Commonwealth met its burden of proving that Defendant's consent was "the product of an essentially free and unconstrained choice." *See Ennels*, 167 A.3d at 723. Accordingly, the Court rejects Defendant's argument that the blood draw constituted an unreasonable search in violation of his constitutional rights.

Consistent with the foregoing, the Court enters the following Order:

## ORDER

AND NOW, this 25th, day of June, 2019, Defendant's Omnibus Pre-trial Motion in the nature of a motion to suppress evidence is DENIED.

BY THE COURT:

Katherine V. Oliver, Judge

Matthew F. Metzger, Esquire
Marc A. Decker, Esquire

15